IN THE SOUTHERN DISTRICT COURT OF THE
UNITED STATES DISTRICT COURT

C43 WATER MANAGEMENT BUILDERS, JV,
a joint venture of The Lane Construction
Corporation and Webuild, Sp.A.

      Plaintiff,

v.

SOUTH FLORIDA WATER MANAGEMENT
DISTRICT, a public corporation of the state of
Florida,

      Defendant.

_____/

## COMPLAINT

    Plaintiff, C43 Water Management Builders, JV ("WMB"), files this Complaint and sues

Defendant, South Florida Water Management District ("District"), a public corporation of the

state of Florida, and in support thereof states:

## INTRODUCTION

    1.    This is an action brought due to the District's wrongful termination of a construction

contract on April 28, 2023.

    2.    The District posted the Notice of Intent to Award, and on or about March 19, 2019,

awarded WMB the Contract (the "Contract") for the project known as the C43 Reservoir Project

("Project"). The Contract was for a lump sum amount of $523,871,000.00.  The initial substantial

completion date at the time of Award was December 23, 2023.

    3.    The Project consists of the construction of a 2-cell reservoir that consists of 10,500

acres, 170,000 acreage feet of water storage, all to assist in providing clean water the Florida

Everglades. To provide scale, the Project area is equivalent in size to almost 8,000 football fields.

4.      The Project contains 19 miles of dam embankment, 15 miles of perimeter canal, 14 major water control structures, recreation features, improvements to the Townsend Canal, and local and site access bridges. Under this Project, the Owner provides the design, with few exceptions.

5.      The District issued its Notice to Proceed (NTP) to WMB on June 3, 2019. WMB started work on the Project shortly thereafter.

6.      From the time WMB started work, WMB's performance continued unabated. During the progress of the work, WMB completed about 70% of the work contemplated by the Contract, in addition to a substantial amount of the many new or extra items of work directed by the District that arose due to changes and modifications to **more than 50%** of the 959 pages of Contract drawings after the Contract was awarded to WMB.

7.      WMB prepared and updated throughout the project, a construction schedule that set forth the critical path of work that is required to be followed to ensure that the Project is being constructed on time and on budget.

8.      The critical path for a construction project is the longest chain of activities, the sum of whose duration determines the project completion date. Delays to a critical path activity will delay project completion unless a work-around, mitigation effort, or acceleration is implemented.

9.      WMB is entitled to at least 322 days of excusable and compensable delay that are the result of two major District design changes and by a District failure to provide the necessary site access.  First, the District changed the elevation of the Blanket Drain installation for over a mile of that work.  However, the District failed to timely provide the required details for the changed work and the changed work was significantly more challenging to implement thereby resulting in substantial delays.  Second, the District changed the design to structure S-478 to rectify deficiencies with the District's original design that made the means and methods to perform the

2

work much more complex and challenging.  The District conceded responsibility for the design change and remitted direct costs associated with the S-478 changes, but wrongfully refused to provide WMB with any additional time or delay costs to implement the more complex and challenging scope of work.  Third, the District's Bid Package 3 contractor fell substantially behind schedule resulting in the District not being able to provide WMB with required project access to perform the critical Project work.

10.     Notwithstanding these three (3) substantial District-caused delays events, the District failed and refused to grant WMB a time extension of even a single day of additional time as required under the Contract.

11.     WMB is not and was not in material breach of the Contract. Prior to issuing the Termination Notice, the District issued a Cure notice to WMB on February 27, 2023 ("Cure Notice"). In the Cure Notice, the District wrongfully asserted that WMB was in material breach of the Contract for: (1) purportedly failing to implement recovery action, and (2) purportedly not providing a recovery plan. WMB, however, had in fact previously provided an easy-to-understand (ETU) schedule on December 16, 2022 showing a recovery plan to achieve Substantial Completion by February 2025, which was a date that the District and WMB had discussed being seemingly acceptable to the District for Substantial Completion. The District did not respond to or even acknowledge WMB's ETU schedule, and subsequently issued the Cure Notice.

12.     In response to the Cure Notice, on March 28, 2023, WMB provided a very detailed recovery schedule, along with a retrospective forensic analysis showing that the predominate and overarching impacts to the Project's progress were District-caused delays entitling WMB to a time extension of 322 calendar days. Accordingly, WMB was entitled under the Contract to a properly adjusted Substantial Completion date of January 24, 2025. WMB's recovery schedule presented a

revised Substantial Completion date of December 24, 2024, one month earlier than the properly adjusted Substantial Completion date. Moreover, as of the date of the District's Cure Notice, the time for WMB's performance of the Contract had not expired, nor had WMB's time for performance expired on the date the Termination Notice was issued, and nor had the District provided or recognized a single day of District-caused delay to the obsolete Substantial Completion date of March 8, 2024 to which the District was attempting to hold WMB.

13.     Following submission of the recovery plan and schedule, WMB sent multiple correspondences – both letters and e-mails – requesting to formally partner and meet with the District to implement the recovery plan. The District went silent and failed to respond to any of WMB's good faith efforts to work with the District in implementing the plan.

14.     Instead of working with WMB, on April 28, 2023, the District issued a Termination for Default Notice ("Termination Notice") which wrongfully terminated WMB's contract for failure to provide an appropriate recovery plan to meet the contractual Substantial Completion of March 8, 2024.

15.     The District's April 28, 2023 Termination Notice states that "the Contractor is in default…as it has not undertaken appropriate recovery actions or provided an appropriate recovery plan." But in fact, WMB's March 29, 2023 response to the Cure Notice fulfilled the requirements of the District's Cure Notice and the Contract requirements, which presented a thorough recovery plan, recovery plan narrative, recovery schedule, and forensic schedule analysis demonstrating that the Contractor was unequivocally entitled to an equitable adjustment of Contract Time and Price. The District did not respond to WMB's request to discuss its recovery plan or recovery schedule. The District's perfunctory Termination Notice failed to make a single statement as to why WMB's robust recovery plan was allegedly insufficient.

16.     At the time of the Termination Notice, however, WMB was entitled to a time extension of at least 322 calendar days, resulting in a properly adjusted Substantial Completion date of no earlier than January 24, 2025.

17.     The District's termination was wrongful, among other reasons, because:

a.     Prior to the District terminating WMB, the District was in first material breach of the Contract for:

   i.   Failing to grant time extensions and/or adjustments to the Contract Time and Contract Price, pursuant to Article 12 of the Contract's General Terms and Conditions, for delays and impacts caused by the District;

   ii.  Failing to provide access to perform work on the critical path in and around the Bid Package 3 project limits, while simultaneously alleging that WMB is in material breach for failing to progress its work;

   iii. Failing to grant time extensions and/or adjustments to the Contract Time and Contract Price, pursuant to Article 12 of the Contract's General Terms and Conditions, for delays and impacts caused by the many changes the District made to its own design;

   iv.  Furnishing WMB with plans and specifications that were substantially and materially deficient such that the design was constantly being revised during the work, thereby breaching the implied warranty of adequate design documents on a design/bid/build project;

   v.   Wrongfully withholding money from pay applications for delayed progress on the Project after WMB provided information and

documentation that the delayed progress was due, in large part, to the District's actions or omissions;

vi.   Failing to comply with the District's duty of good faith and fair dealing;

vii.   Failing to cooperate with WMB and not hinder, interfere, disrupt, or delay WMB's performance of the work; and

viii.   Failing to comply with Article 16 of the Contract's General Terms and Conditions.

## THE PARTIES

18.   WMB is a general joint venture between The Lane Construction Corporation and WeBuild, Sp.A., f/k/a Salini Impregilo, Sp.A. The Lane Construction Corporation is incorporated in, and has its principal place of business in the state of Connecticut. WeBuild, Sp.A. is a foreign corporation based in Milan, Italy. WMB is not a separate entity formed under Florida law.

19.   The District is a public corporation of the state of Florida with its principal place of business in Palm Beach County, Florida.

## JURISDICTION AND VENUE

20.   Pursuant to 28 U.S.C. § 1332(a), this Court has diversity jurisdiction over this matter because the parties have complete diversity of citizenship and the amount in controversy exceeds $75,000.

21.   Venue is proper in the Southern District of Florida as the Contract requires venue in a court of competent jurisdiction located in the state of Florida, Palm Beach County.

## FACTUAL BACKGROUND

22.   The Project is one part of the state of Florida's efforts to restore and revitalize the Florida Everglades.

23.     The subject Project is part of a bigger overall project that has four (4) separate but interlinked packages – Bid Package 1 – Preload Mounds and Demolition of Existing Facilities; Bid Package 2 – Irrigation Pump Station; Bid Package 3 – C43 Reservoir Pump Station S-470 Project; and Bid Package 4 – C43 West Basin Storage Reservoir Civil Works Project.

24.     Of importance for this lawsuit, WMB was contracted for Bid Package 4 (BP4) to construct the C43 Reservoir, while Harry Pepper & Associates was contracted separately to construct the adjoining predecessor Bid Package 3 (BP3) – S-470 Pump Station.

25.     The BP3 work area had specifically delineated project limits that overlapped and adjoined the BP4 project limits. WMB was not permitted to access the overlapping and adjoining areas unless and until the District authorized access.

**The Project, The Initial Designers, and the Contract**

26.     The Project (which can interchangeably be referred to herein as the BP4 project) is a bid/build project, meaning that the District bears full responsibility for the design and engineering of the Project and full responsibility for the "For Construction" drawings, which were used by bidders to develop their bid estimates and pricing for the Project.

27.     The Project consists of a two-celled embankment dam with an internal cut-off wall. Construction includes other accompanying features such as a perimeter canal, multiple water control structures, a groundwater pressure relief system, multiple bridges, improvements to the existing Townsend Canal, and ancillary recreation features on a site two-thirds the size of Manhattan Island.

28.     The District retained Carollo Engineers and Stanley Consultants ("Stanley and Carollo") to be the District's Engineer of Record and to perform all engineering and design for the Project, including preparation of Project plans and specifications.

7

29.     On November 16, 2018, the District advertised the Project for bid using a fixed price bid/build project delivery method, keeping the design liability on the District's side. WMB bears no responsibility for the design.

30.     As part of the bid documents to be relied on by bidders, the District included Stanley and Carollo's plans and specifications.

31.     WMB's bid was based upon Stanley and Carollo's design included as part of the bid documents.

32.     The Contract included General Terms & Conditions, General Requirements, Bidding Documents, Technical Specifications and drawings (collectively referred to herein as the "Contract Documents"). A copy of the Contract is attached hereto as Exhibit "A" and the General Terms & Conditions are attached hereto as Exhibit "B". The remaining Contract Documents are too voluminous to attach, but will be made available as necessary.

33.     The District issued a NTP on June 3, 2019, a copy of which is attached hereto as Exhibit "C". The NTP established the original Substantial Completion date as December 23, 2023 and Final Completion date as July 24, 2024.

34.     Following issuance of the NTP, the Contractor divided up the work into segment A through G, based on predetermined expected settlement periods in the Contract drawings which is depicted in the general layout and segment division below:





**The District's Termination of its Initial Designers**

35.    After the bid was submitted, but before the work commenced, the District terminated Stanley and Carollo as the Engineer of Record.

36.    Upon information and belief, the District terminated Stanley and Carollo due to design deficiencies, among other reasons. The reason for this belief is that **more than 50%** of the 959 pages of Contract drawings had to be changed and modified during the Project.

37.    The District replaced Stanley and Carollo on the Project with Black and Veatch.

38.    Following Black and Veatch takeover, Black and Veatch was reluctant to take on any obligation to accept design liability for the work of Stanley and Carollo or to stamp and seal any revised drawings for the District.

39.    It was imperative that Black and Veatch sign and seal revised drawings and accept design liability because the original design by Stanley and Carollo was deficient in many respects resulting in Blanket Drain design changes, complete re-design of S-478, and other significant re-design efforts of the concrete structures, as described in greater detail below.

40.    Indeed, Black and Veatch's refusal to sign and seal the revised Blanket Drain design — discussed more fully below — dramatically impacted the timely progress of work on the Project's critical path.

**Bid Package 3 Access Limitations**

41.    To plan the work, WMB was obligated to develop a project schedule utilizing the critical path method, which is reliant on specific time frames to start and complete aspects of the work so that the Project can be completed on time and on budget.

42.    One of the work features that needed to be planned for was the construction of the S-470 Pump Station and S-483 structures in the northwest corner of the Project. These structures,

however, were located in and around the adjoining BP3 project limits – meaning that WMB could not perform work on the structures or the dam embankment unless and until the District granted WMB access.

43.     Because the District would not allow WMB unfettered access in and around the adjoining BP3 project limits, WMB issued Request for Information (RFI) No. 1 on June 17, 2019 asking for clarification of when WMB should expect to receive access to the BP3 area.

44.     On July 15, 2019, the District responded and specifically stated that the "dam embankment placement adjacent to the S-470 Pump Station could commence as early as May 2021 with the Phase 1 soil bentonite wall and foundation preparation…."

45.     Relying upon the District's response, WMB developed its baseline schedule targeting May 2021 as the expected date of access in and around BP3 project limits, and thus, planned its work accordingly.

46.     The District reviewed and accepted WMB's baseline schedule, which utilized the District's information and assurances, on January 27, 2020.

**Initial Project Delays and Revised Project Schedule**

47.     After receiving the NTP, the Project progress sustained some moderate delays during the first year of work, which are not the subject of this dispute.

48.     In June 2021, the District requested an initial recovery schedule.

49.     On July 22, 2021, WMB re-sequenced the work and submitted a revised Project schedule.

50.     On July 28, 2021, the District accepted WMB's re-sequenced Project schedule.

51.     Following submission and acceptance of the revised Project schedule, the Project began to experience significant District-caused delays and impacts.

52.     In the Contract's General Terms and Conditions at Article 12, the parties agreed to specific terms related to adjustments of time and compensation arising out of delays to the work. WMB provided timely notice of such delays and impacts to the District in accordance with the Contract.

53.     Article 12.3 pertains to Delays Outside of Contractor's Control:

> 12.3    *Delays Beyond CONTRACTOR's Control:* Where CONTRACTOR is prevented from completing any part of the Work within the CONTRACT Times (or Milestones) due to delay beyond the control of CONTRACTOR, the CONTRACT Times (or Milestones) may be extended in an amount equal to the time lost due to such delay if a Claim is made therefore as provided in paragraph 12.02.A. Delays beyond the control of CONTRACTOR may include acts or neglect of utility owners or other CONTRACTORs performing other work as contemplated by Article 7, fires, floods, epidemics, abnormal weather conditions or acts of God. If abnormal weather conditions are the basis for a claim for additional time, such claim shall be documented by data substantiating that (1) weather conditions were abnormal for the period of time, (2) the abnormal weather could not have been reasonably anticipated, and (3) that weather conditions had an adverse effect on the scheduled construction's critical path.

54.     Based upon Article 12.3, WMB is entitled to request an extension of Contract Time if the work is delayed by an act, omission, occurrence, or decision that is outside of WMB's control.

55.     As discussed below, the critical path of the work set forth in the revised Project schedule was unequivocally impacted by and through District-caused actions or omissions.

**The District's Blanket Drain Design Change in Segments F3/F4 Delays the Critical Path**

56.     The Blanket Drain system is a significantly integral component of the dam embankment, as it is a drainage system that prevents internal erosion of the dam foundation and/or embankment, and it creates stability of the dam embankment.

57.     The Blanket Drain consists of different types of sands layered on top of each other which end at a Toe Drain, and which is routed through End Walls to direct water away from the

dam embankment. The Blanket Drain system, including the Toe Drain, encircles the 19 miles of dam embankment.

58.    The picture below shows a typical blanket drain on the original plans and specifications:



59.    In November 2020, the District realized it needed to change the elevation of the Blanket Drain due to the presence of very hard limestone between Segments F3 and F4 — over one (1) mile of Blanket Drain construction.   If unaddressed, the hard limestone condition would increase the time and cost of installation of the Blanket Drain system by having to excavate through unanticipated hard rock.

60.    The District issued Request for Proposal No. 8 to address the deficiencies in the design by requesting that WMB submit a proposal to raise the Blanket Drain system in the area of the hard limestone rock.

61.    In response, WMB submitted Value Engineering Proposal No. 1 ("VEP  No. 1") with a preliminary conceptual plan to raise the Blanket Drain in the impacted area.  WMB further

made internal adjustments to its planned schedule of work to keep the Blanket Drain from impacting the Project's critical path to afford the District with time to review the VEP No. 1.

62.     The District, however, refused to consider WMB's VEP No. 1 and instead rejected it outright stating that it would not accept WMB's proposed design revisions as the District solely retained design responsibility.

63.     On May 22, 2021, the District issued Work Change Directive No. 4 to WMB with hand drawn sketches of a revised scope of work to raise the Blanket Drain.

64.     The hand drawn sketches, however, were not signed and sealed by the District's replacement engineer, Black and Veatch, because Black and Veatch refused to revise the Project design developed by the District's original engineers, Stanley and Carollo, being a design liability issue.

65.     The District's hand drawn sketches were woefully inadequate for WMB (or any other contractor) to carry out the changed work required to raise more than a mile of the Blanket Drain installation because, among other things, the hand drawn sketches did not provide the design elevations for the entire revised Blanket Drain installation.

66.     The substantial delays in resolving the deficiencies in the District's design resulted in the Blanket Drain work delaying the critical path of the Project.

67.     Although it was not obligated to do so, WMB undertook its own subsurface explorations to map the existing surface of the limestone in the impacted areas in order to facilitate the preparation of usable design drawings for the changed work.  WMB undertook these efforts to mitigate the District-caused delays to the changed Blanket Drain installation.

68.     WMB coordinated its design efforts with the District and ultimately resolved the remaining District-caused design conflicts through Request for Information (RFI) No. 266 dated

August 13, 2021; however, the District did not provide approval of the revised drawings until September 29, 2021.

69.     Nevertheless, WMB proceeded, at its own risk, with commencing work on the revised drawings on August 24, 2021 in an attempt to mitigate the District-caused delays.

70.     The revised Blanket Drain design between Segments F3 and F4 delayed progress of the work because (a) additional survey work was required, (b) different equipment needed to be procured, (c) there was a learning curve in performing the revised work, and (d) the work necessary to build the revised Blanket Drain was more difficult and time consuming due to the revised geometry of the Toe Drain. Moreover, although in limited quantities, the need for hard rock removal along the Toe Drain remained to be a requirement.

71.     Due to the delays caused by the changed Blanket Drain design between segments F3 and F4, the Project sustained significant delays by the Blanket Drain being driven onto the Project critical path.

72.     On January 22, 2022, WMB submitted its claim for additional time and compensation related to the District-caused Blanket Drain delays along with the contractually required time impact analysis.

73.     In response, the District denied the claim and WMB elevated the matter to the contractually required step negotiation process under Article 16.3 of the Contract's General Terms and Conditions.

74.     The District failed to hold a timely meeting to discuss the Blanket Drain claim during the Project.

75.     As of the date of this Complaint, WMB had completed construction of the changed Blanket Drain design between F3/F4 and incurred actual schedule delays and additional costs to perform the changed work, together with prolongation costs.

76.     The District did not pay for the additional costs for WMB to perform the extra work associated with the changed Blanket Drain design, despite issuing its Work Change Directive demanding WMB perform the extra work.

**The District's Re-Design of S-478 Further Delayed the Project Critical Path**

77.     As the revised Blanket Drain work was on-going, the District caused further significant delays to WMB's work by completely re-designing structure S-478 after WMB had already started constructing the structure.

78.     S-478 is a bridge and water control structure (a weir) that controls the water flow from the nearby Roberts Canal to the new perimeter canal constructed on the Project. Furthermore, S-478 maintains the minimum dry season water surface elevation in the Roberts Canal.

79.     S-478 is located in Segment F4 of the Project layout, a photo of which is below:



80.    WMB started work at S-478 in July 2020 and by November 2020, WMB had completed a portion of its original scope.

81.    In November 2020, the District directed WMB to suspend work on S-478 due to the District's desire to completely re-design S-478.

82.    On June 18, 2021, the District issued a Request for Proposal (RFP) asking WMB to price the re-designed S-478 structure.

83.    The District's re-design efforts took approximately eight (8) months to complete and issue to the Contractor.

84.    The District's deficient design was acknowledged in its RFP No. 17 where the District stated that "a review of the District's hydraulic analysis indicated changes were required to the structure discharge."

85.    Ultimately, the District issued Work Change Directive No. 5 for S-478 on August 24, 2021, a copy of which is attached as Exhibit D.

86.     In WCD No. 5, the District instructed WMB to commence work on the re-designed S-478 with a direct cost price of $2,334,265.19, and with an increase of time noted as being under review.

87.     Upon receipt of WCD No. 5, WMB commenced work on S-478, which included all preparatory works, including, but not limited to, preparing a revised excavation and phased construction plan, a revised dewatering plan, obtaining a revised dewatering permit, and procuring newly specified long lead items.

88.     Additionally, the S-478 re-design was more complex due to the multi-phased dewatering plan required.

89.     By the end of 2021, S-478 overtook the revised Blanket Drain activities as driving the Project critical path.

90.     Following issuance of WCD No. 5, the District agreed that WMB was entitled to $1.8 million in direct costs related to the construction of the re-designed S-478 structure.

91.     However, even though it acknowledged that there would be an increase in Contract Time associated with WCD No. 5, the District reversed itself without justification and issued a denial of any time impacts associated with the S-478 re-design.

92.     On January 25, 2022, WMB requested step negotiations on its request for an equitable adjustment of the Contract Price and Time due delays and prolongation costs caused by the District's S-478 re-design; however, the District wrongfully refused to schedule a step negotiation meeting.

**The District Restricts Access at the BP3 Area Further Delaying the Project Critical Path**

93.     While WMB was dealing with the District's deficient design issues on the Blanket Drain between Segments F3 and F4 and the S-478 structure re-design, WMB encountered impediments to access to the BP3 area, delaying work in that area.

94.     The BP3 area is located in the northwest corner of the Project with its primary feature being the S-470 Pump Station.

95.     As stated above, the S-470 Pump Station was contracted to be built by Harry Pepper & Associates.

96.     The BP3 area also contains other WMB items of work, most notably structure S-483, whose purpose is to maintain the desired water surface elevation in the perimeter canal upstream of S-483.

97.     WMB structured its baseline Project schedule using the May 2021 access date provided by the District as to portions of the BP3 area and to the entirety of the BP3 area by May 2022.

98.     WMB was wrongfully denied access to the BP3 area in May 2021. In fact, WMB did not obtain access to the BP3 area at all in 2021 or the beginning of 2022.

99.     On April 15, 2022, the District emailed WMB and informed WMB that the BP3 project completion date had been delayed until July 31, 2022.

100.    Shortly thereafter, WMB issued a claim for the impacts arising from the lack of access, including the fact that the "delayed access to BP3 impacts the dam construction in segments L and K,.., causing a domino effect to the Project completion."

101.    The District responded to WMB's letter on June 23, 2022, stating that "there is nothing preventing the Contractor from proceeding with construction of structure S-483."

102.     The truth is, however, aerial photos of BP3 area indicated a much different reality. The BP3 contractor, Harry Pepper, was using the S-483 area for access, and had materials and equipment stored in a laydown area that interfered with WMB's ability to perform its work in this area.

103.     Indeed, on several occasions between May 2022 and September 2022, WMB attempted to gain access and perform work near the structures in the BP3 area, but WMB was prevented from doing so by the District.

104.     Ultimately, the BP3 contractor, Harry Pepper, did not clear the S-483 area until the first week of September 2022, but on September 14, 2022, the District instructed WMB not to begin work at S-483 until after the District's "taking over" ceremony of the S-470 Pump Station on September 27, 2022.

105.     On September 23, 2022, however, the District reversed course and instructed WMB to begin work at S-483 due to the "taking over" ceremony being cancelled.

106.     As such, the District did not grant WMB access to commence work at S-483 for more than a full year (May 2021 to September 2022) after the date the District promised in its response to WMB's RFI No. 1.

107.     In addition to the delayed access at S-483, WMB was delayed in gaining access at S-470, which is also within the BP3 area.

108.     WMB requested access to the BP3 area as early as June 9, 2021 to begin clearing work at S-470.

109.     The District denied WMB's access at that time stating that the dewatering pipe in use by the BP3 contractor, Harry Pepper, had to remain in place.

110.     By April 4, 2022 – ten (10) months after the date that the District promised access – WMB finally gained some partial access to segments L1 and K1 in the BP3 area, allowing foundation preparation and soil bentonite wall work to proceed, but still awaited access to the remainder of the BP3 area.

111.     Even after gaining partial access in April 2022 along the dam foundation, the District continued to refuse WMB access to the area behind the BP3 Pumping Station.

112.     Indeed, on August 5, 2022, WMB informed the District of the urgent need to start work on the underlying dam at S-470 and that WMB intended to begin excavation; however, the District would not allow WMB to proceed with work because the District's BP3 contractor, Harry Pepper, had not completed its work at the S-470 Pumping Station, and that the Toe Drain in this area needed to be redesigned.

113.     Notwithstanding the District's acknowledgement that the Toe Drain had to be redesigned, the District failed to issue Work Change Directive No. 19 directing the design change until January 4, 2023.

114.     Upon receipt of Work Change Directive No. 19, WMB promptly resubmitted its work plan to commence work at S-470 — as it had on numerous occasions prior to January 4, 2023 only to have it wrongfully rejected by the District for non-material reasons.

115.     Remarkably, WMB's work plan was accepted the following day, January 5, 2023.

116.     Thus, it is unescapable that the District's previous rejections of WMB's work plan were simply a delay tactic because the BP3 contractor, Harry Pepper, had not completed its work, and the District had decided to keep WMB out of the area near S-470 until it was ready.

117.    Finally, WMB obtained access to perform the underlying dam work at S-470 on January 19, 2023; however, the critical path of the Project had flowed through S-470 since April 2022, thereby creating a significant delay to the Substantial Completion date of the Project.

**BP3 Performance Delays Caused by the District**

118.    In addition to the District's failure to provide access to perform work in the BP3 area, the District also impacted and delayed WMB's work once access was provided.

119.    For example, once WMB commenced work at S-483, the District issued Field Order No. 26 on August 12, 2022 imposing restrictions on the work at S-483 because a new ALUM facility interfered with the excavation and dewatering limits at S-483.

120.    Because of the restrictions imposed by the District, WMB could not progress its work at S-483, which delayed WMB's critical path progress at S-483.

121.    Additionally, WMB's progress was further impacted by the existence of buried conduits and ground loop from the BP3 contractor, Harry Pepper, that were inside the S-483 excavation area, which delayed work on the critical path.

122.    The District has refused to acknowledge that its work restrictions delayed work on the critical path at S-483. The District has refused to provide any critical path analysis to support its refusal.

123.    As with the work at S-483, WMB's progress at S-470 was delayed by issues outside of its control once access was provided, including, but not limited to, improper grouting of the dewatering system components by the BP3 contractor, Harry Pepper, and additional design changes by the District after WMB commenced work on the underlying dam at S-470.

124.    WMB submitted claims to the District for an equitable adjustment to the Contract Time and Price associated with the District's failure to provide access to perform critical path work

at S-483 and S-470 as well as the District's delays to the progress of critical path work following access being granted. The District, however, wrongfully denied any responsibility for delays or impacts.

125.    Pursuant to Section 16 of the Contract's General Terms and Conditions, WMB requested step negotiations on the foregoing claims; however, the District failed and refused to schedule a meeting to attempt resolution of the claims.

**The District Only Provided Extensions of Time for Weather Related Events and COVID**

126.    To date, the District has only provided a total of seventy-six (76) days of Contract Time extensions, none of which pertained to the District-caused delays discussed above.

127.    Specifically, the District provided the following Contract Time extensions: (a) thirteen (13) calendar days for Tropical Storm Eta, (b) eight (8) calendar days for Tropical Storm Elsa, (c) forty-one (41) calendar days for COVID-19 impacts, and (d) fourteen (14) calendar days for Hurricane Ian.

128.    As of April 28, 2023 – the date of the Termination Notice – the Contract Substantial Completion was March 8, 2024.

**District Demands Acceleration of Work Despite Excusable District-Caused Delays**

129.    Notwithstanding all of the excusable and compensable District-caused delays noted above, and WMB's requests for extensions of time under the Contract for same, the District repeatedly and wrongfully insisted that WMB meet the Contractual Substantial Completion date without consideration of the excusable delays – thereby effectively demanding acceleration.

130.    In fact, on July 14, 2022, the District demanded a written recovery plan and told WMB to assume that it would receive zero additional days to complete the Project by the substantial completion date.

131.     The District's demand, however, was in direct contravention to Article 12.3 of the Contract's General Terms and Conditions, which provides that the District is obligated to extend the Contract Time where WMB is "prevented from completing any part of the Work…due to delays beyond the control of the [WMB]."

132.     In response to the District's demands, WMB advised the District on multiple occasions that WMB was entitled to an equitable adjustment to the Contract Time for District-caused delays and impacts and that WMB did not need to accelerate the work to meet the contractually adjusted Contract Substantial Completion date; however, in an effort to work with the District, WMB nonetheless deployed additional resources at a great extra cost to WMB to overcome the District-caused delays.

**The District's Repeated Maladministration of the Contract**

133.     The District administered the Contract in a manner that deprived WMB of payment for its properly performed work.

134.     The District unilaterally reduced certain of WMB's payment line items on its applications for payment reducing the amount of payment available to WMB for completed work.

135.     In a letter dated December 22, 2021, John Creswell of the District informed WMB that the District was unilaterally reducing certain of Contractor's payment line items thereby reducing the available payment to WMB for work performed and accepted by the District. The District's action was not permitted under the Contract. Further, the alleged basis for the reduction increasing negative float to the Project schedule. The alleged negative float, though, was the direct result of the substantial District-caused delays.

136.    The District issued Request for Proposal No. 37, dated November 17, 2022 for a design change to add Rip Rap to certain structures on the Project.  In response, WMB provided its proposal for the additional costs and documentation supporting the basis for its additional costs.

137.    The District refused to negotiate with WMB for the additional costs associated with the Rip Rap design change and instead issued a Work Change Directive directing WMB to proceed with the changed work for payment of only $300,000.  The District failed to provide any justification for its substantially lower costs to implement this changed work.

138.    The District failed to timely provide Change Orders in compliance with the Contract for certain of the agreed upon direct costs of District changes thereby depriving WMB of its ability to recover costs for performing the changed work.

139.    WMB and the District negotiated a change order for the amount of $2.3M for District-directed changed work to the S-475 structure.  The District, however, issued a proposed change order that contained language providing that "this change order and all claim records pertaining to this change order shall not be admissible for any purpose in any litigation involving the Project."

140.    The District's attempt to treat the change order and all claim and notice documentation related to the S-475 design change issue as not admissible is contrary to the express terms of the Contract.

141.    The District refused to remove the objectionable conditions from the change order thereby preventing payment of the agreed upon costs to WMB for the completed S-475 change work.

142.    The Contract's disputes process requires that the parties negotiate claims that could not be resolved at the project level through executive level negotiations referred to as "Step Negotiations".

143.    The District failed and refused to timely schedule Step Negotiations to resolve WMB's pending claims.

144.    There were, at least, seven (7) major claims with an approximate total value of $67M asserted by WMB that were either awaiting a District response or for the District to allow for Step One Negotiations to proceed.

145.    Notwithstanding WMB's repeated requests to initiate Step One Negotiations, the District failed and refused to schedule the negotiations.  The District's failure in this regard deprived WMB the opportunity to negotiate a resolution of substantial pending claims involving costs for work that WMB had largely already performed.

**WMB and the District Meet to Discuss Project Progress and the ETU Schedule**

146.    In November and December 2022, the CEO of The Lane Construction Corporation, one of the members of WMB, and the Executive Director of the District met to discuss the Project progress to seemingly work through some of the hurdles that WMB had experienced on the Project.

147.    At the meetings, the District indicated it was willing to entertain a revised Substantial Completion date of February 2025, so long as WMB provided an easy-to-understand (ETU) schedule showing how the work could be performed and completed by February 2025 – which would be an extension of time of nearly one (1) year.

148.    On December 16, 2022, WMB provided the ETU schedule requested by the District to start a dialogue with the District on reasonable and realistic dates for Project completion.

149.    The District did not timely respond to WMB's submission and refused to discuss the details of the ETU schedule's planned sequence of work, the timing of the work, or otherwise to offer any questions or comments.

150.    Instead, on February 13, 2023, more than fifty (50) days after the ETU schedule was submitted for discussion, the District responded by stating that the ETU schedule "does not provide sufficient information to validate WMB's ability to achieve Substantial Completion by February 2025."

151.    The District failed to even explain what was purportedly missing in the ETU schedule – that the District requested – so that the parties could meet in good faith to discuss.

**The District Issues a Cure Notice Seeking a Recovery Plan to Meet an Unadjusted Contractual Substantial Completion Date**

152.    Instead of working with WMB to resolve or identify any issues with the ETU schedule, the District took the drastic step of issuing a Cure Notice on February 27, 2023.

153.    In the Cure Notice, the District wrongfully and inaccurately stated that WMB was in material breach of the Contract by failing to take appropriate recovery action or to submit a written recovery plan.

154.    The Cure Notice further demanded that WMB cure the material breach by taking "appropriate recovery action" and "submitting a recovery plan" within thirty (30) days.

155.    At the time of issuing the Cure Notice, the Contractual Substantial Completion date of March 8, 2024 was more than a year away.

156.    The Cure Notice did not cite or raise any other basis for material breach of contract.

157.    In fact, the District, on numerous occasions prior to issuing the Cure Notice, advised WMB that the work being performed was excellent and never raised quality of work as an issue.

**WMB Timely Responds to the Cure Notice with a Robust and Detailed Recovery Plan**

158.    In response to the Cure Notice, WMB spent considerable time, effort, and money to develop a detailed, specific recovery plan and recovery schedule.

159.    On March 29, 2023, within the 30-day response time allocated by the District in its Cure Notice, WMB provided the District with the specific recovery plan and recovery schedule that was accompanied by a schedule analysis prepared by an independent schedule consultant, a copy of which is attached as Exhibit E.

160.    WMB's schedule analysis determined that, as of January 2023, the District had caused 322 compensable days of delay to the Project's critical path – which pushed the properly adjusted Contractual Substantial Completion date to January 24, 2025.

161.    Nonetheless, WMB provided a recovery plan and schedule that showed, in painstaking detail, acceleration measures that would enable WMB to substantially complete the Project by December 24, 2024, more than one month earlier than the properly adjusted Contractual Substantial Completion date.

162.    The contractual Substantial Completion date should have been adjusted to January 24, 2025 to account for the delays beyond WMB's control, thereby making WMB's recovery plan and schedule, showing December 24, 2024 as the Substantial Completion date, more than reasonable and acceptable.

**The District Prematurely Moves on From WMB Before Expiration of the Contractual Cure Period**

163.    Before submitting the recovery plan and schedule on March 29, 2023, WMB immediately commenced efforts to procure additional labor, materials, equipment, and resources to ensure it could and would meet the dates set forth in WMB's recovery plan and schedule.

164.    To procure additional labor resources, WMB retained an employment talent agency to assist in hiring qualified individuals.

165.    During WMB's hiring process, WMB was informed on March 13, 2023 that the District had already retained a replacement contractor and that the replacement contractor was using the same employment agency to hire personnel to work on the Project because WMB was going to be terminated.

166.    The District's premature actions to hire personnel in March 2023 impeded WMB's ability to secure labor to implement its own recovery plan.

167.    Based upon information and belief, the District made a decision to terminate WMB prior to receiving WMB's response to the Cure Notice and the recovery plan and schedule.

**The District Issues Its Termination for Default Notice**

168.    Despite submission of a detailed recovery plan and schedule, the District issued its bland and perfunctory Termination Notice on April 28, 2023 stating that WMB "is in default for failing to cure the material breach within the thirty (30) day timeframe referenced in the Cure Notice, as it has not undertaken appropriate recovery actions or provided an appropriate recovery plan."

169.    In its Termination Notice, the District failed to identify a single portion of WMB's 150-page response to Cure Notice and recovery plan and schedule that it deemed to be insufficient or inappropriate.

## COUNT I

### (Breach of Contract – Wrongful Termination)

170.    WMB realleges and incorporates by reference paragraphs 1 through 169 as if set forth full herein.

171.    All conditions precedent to bringing this action have occurred or have otherwise been waived.

172.    In the Termination Notice, the District incorrectly alleged that WMB was in material breach by failing to provide an appropriate recovery plan and recovery schedule.

173.    Pursuant to Article 15.3 of the Contract's General Terms and Conditions, a material breach of the Contract is controlled by Florida Administrative Code §40E-7.215. Specifically, a "material breach" is a substantial "unexcused non-performance" of a contractual obligation. F.A.C. §40E-7.215(5); *see also,* Article 1 of the Contract's General Terms and Conditions.

174.    However, the same Florida Administrative Code section defines what constitutes **excusable** **non-performance**, to wit: "a failure to perform an act that is an important part of the transaction or performing an act inconsistent with the terms and conditions of the contract, **due to some action or inaction by the District, making performance by the contracting entity impossible or beyond the contracting entity's control.**" *See,* F.A.C. §40E.7.215(4).

175.    As set forth in WMB's response to the Cure Notice, WMB was entitled to an extension of the Contract Time of <u>at least</u> 322 calendar days due to District-caused delays that were beyond WMB's control – which pushed the adjusted Substantial Completion date to January 24, 2025.

176.    WMB submitted a recovery plan and schedule showing that it could achieve Substantial Completion by December 24, 2024 – more than one (1) month prior to the properly adjusted Substantial Completion date – when taking in to account the District-caused delays that created the excusable non-performance.

177.   WMB provided an appropriate recovery plan and schedule as requested by the District when considering the District-caused delays for which WMB was entitled to an adjustment of both the Contract Time and Price.

178.   WMB was not and could not be in material breach of the Contract as there was no substantial unexcused non-performance of a contractual obligation.

179.   As such, the District wrongfully terminated WMB on the Project and materially breached the Contract by doing so.

180.   Despite the deleterious effects of the District's action and inactions on the Project and the District's failure to timely and fully pay WMB for the work performed, WMB continued to perform its obligations under the Contract.

181.   In addition to breaching the Contract by wrongfully terminating WMB on the Project, the District was in first material breach of the Contract by, among other things:

a.   Failing to grant appropriate time extensions and/or adjustments to the Contract Time and Contract Price, as the case may be, for delays and impacts caused by the District;

b.   Failing to provide access to perform work on the critical path in and around the Bid Package 3 project limits, while simultaneously alleging that WMB was in material breach for failing to progress its work;

c.   Furnishing WMB with plans and specifications that were substantially and materially deficient such that the design was frequently being revised during the work, thereby breaching the District's warranty of adequate design documents;

d.   Wrongfully withholding money from pay applications for delayed progress on the Project after WMB provided information and documentation that the delayed progress was due to the District's actions or omissions;

e.   Failing to cooperate with WMB and not hinder, interfere, disrupt, or delay WMB's performance of the work; and

    f.   Failing to comply with Article 16 of the Contract's General Terms and Conditions by refusing to negotiate in good faith during contractual STEP negotiations, failing to issue change orders following successful resolution of a claim, and failing to schedule claims for step negotiations within a reasonable period of time.

182.    As a direct and proximate result of the District's wrongful termination and material breach of contract, WMB has sustained damages in excess of $100,000,000.00, which will include, and are not limited to:

    a.   The cost of completed work during March 2023, which was submitted to the District and agreed upon through a pencil copy of the pay application;

    b.   The cost of completed work during April 2023;

    c.   Retainage;

    d.   The cost of equipment owned by WMB that the District has improperly taken possession of and has not paid fair value for;

    e.   Salaries and hourly wages to be paid following wrongful termination to WMB's employees;

    f.   Demobilization costs, including, but not limited to, early lease termination costs;

    g.   Additional direct costs to perform the changed Blanket Drain work at Segments F3/F4;

    h.   The cost of performing work pursuant to agreements reached in step negotiations that the District has since refused or neglected to pay for, including, but not limited to, extra work at S-475 and Townsend Canal road;

    i.   The cost of hiring, training, and certified equipment operators that WMB will lose the benefit of on the Project;

    j.   Constructive acceleration damages; and

    k.   Consequential, special, or incidental damages.

183.    Pursuant to Article 15.3 of the Contract's General Terms and Conditions and Section 57.105(7), Fla. Stat., WMB is entitled to recoup its attorney fees incurred as a result of bringing this action and the District's wrongful termination.

WHEREFORE, WMB demands judgment against the District for all the damages caused by District's wrongful termination and material breach of the Contract, plus pre-judgement and

post-judgement interest, costs, attorney fees, and other such relief as this Court deems just and appropriate.

## COUNT II

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

184.    WMB realleges and incorporates paragraphs 1 through 185 as if set forth fully herein.

185.    In addition to the District's wrongful termination and material breach of the Contract, the District also breached the implied covenant of good faith and fair dealing inherent in every contract entered into in the State of Florida.

186.    Pursuant to Article 16.3 of the Contract's General Terms and Conditions, WMB's claims on the Project were to be resolved through Step Negotiations.

187.    Further, pursuant to Article 16.1B. of the Contract's General Terms and Conditions, the parties "will participate in good faith in the procedures in [Article 16]."

188.    As of the Termination Notice date, the District had before it seven (7) major claims asserted by WMB and elevated to Step Negotiations that were pending in the total approximate value of $67 million in additional costs and over one (1) year in requested time extensions.

189.    WMB repeatedly requested the District to expedite the claims through the Step Negotiation process. The District, however, failed to facilitate a timely resolution of the pending claims putting WMB in the position of financing the project.

190.    WMB had the reasonable expectation under the Contract that where it was directed to perform changed work or was otherwise impacted for causes not of its fault or responsibility that the District would fairly exercise the Change of Contract Time and Change of Contract Price clauses found in Article 12 of the Contract's General Terms and Conditions.

33

191.    Further, where there was a disagreement on the extent of the Changes, WMB had a reasonable expectation that such issues would be dealt with in good faith and in a timely manner through the Contract's Step Negotiation process.

192.    On a Project with an original duration of 1,878 days to Final Completion, the District only awarded a total of seventy-six (76) days of extension for named storms and COVID-19, despite numerous design changes and a lack of access to perform work on the critical path.

193.    Additionally, the District breached the implied covenant of good faith and fair dealing through its repeated wrongful and improper administration of the Contract, as set forth more fully in paragraphs 133 – 145, by, among other things:

   a.    unilaterally and wrongfully reducing certain of WMB's payment line items on WMB's applications for payment reducing the amount of payment available to WMB for completed work the alleged basis for which was the result of increasing negative float to the Project schedule, despite WMB being entitled to Contract Time extensions;

   b.    issuing unilateral Work Change Directives for amounts significantly less than WMB's cost proposals to the District's requests for proposal on changed or extra work, and refusing to remit payment or approve the actual costs to perform said work; and

   c.    failing to issue Change Orders for certain of WMB's agreed direct costs for performing the District directed changes thereby depriving WMB of its ability to recover costs for performed changed work.

194.    As a direct and proximate result of the District's breach of the implied covenant of good faith and fair dealing, WMB has sustained damages in an amount to be proven at trial, as well as interest and costs.

WHEREFORE, WMB demands judgment against the District for all the damages caused by the District's breach of the implied covenant of good faith and fair dealing, plus pre-judgement

and post-judgement interest, costs, attorney fees, and other such relief as this Court deems just and appropriate.

## COUNT III

### (Declaratory Judgment Action)

195.     WMB realleges and incorporates paragraphs 1 through 196 as if set forth fully herein.

196.     This is an action for declaratory judgment under the Federal Declaratory Judgment Act, 28 USC § 2201 and 2202.

197.     An actual case and controversy exists between the parties that may be adjudicated by this Court consistent with U.S. CONST. art. III, § 2, cl. 1.

198.     All parties having an interest in the declaration sought are parties to this action.

199.     WMB is not merely seeking legal advice by or through this declaratory judgment.

200.     Pursuant to Article 15.3 of the Contract's General Terms and Conditions, once the District issues a Termination Notice, "the District's Governing Board shall determine where the Contractor should be suspended from doing future work with the District, and if so, for what period of time."

201.     If the Termination Notice stands and the District's Governing Board suspends WMB's partners from performing future work, WMB's partners will be required to disclose same when pursuing future work.

202.     As such, the District's decision to wrongfully terminate WMB on the Project can impact its partners' ability to obtain new work in Florida and around the United States.

203.    WMB seeks a declaration that the District's termination was wrongful, that WMB was not in material breach of the Contract, and that the District's Termination for Default Notice should be rescinded as being wrongful.

WHEREFORE, WMB demands a declaratory judgment consistent with the requested relief above.

Dated: May 3, 2023

***Counsel for C43 Water Management Builders JV***

/s/ Denis L. Durkin

Denis L. Durkin, Esquire
FL Bar Number: 237132
Primary Email: ddurkin@bakerlaw.com
Secondary email: fapodaca@bakerlaw.com
orlbakerdocket@bakerlaw.com
Robert W. Thielhelm, Jr., Esquire
FL Bar Number: 889679
Primary Email: rthielhelm@bakerlaw.com
Maureen B. Soles, Esquire
FL Bar Number: 1003803
Primary Email: msoles@bakerlaw.com
Secondary Email: smccoy@bakerlaw.com
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Post Office Box 112
Orlando, FL 32802-0112
Telephone: (407) 649-4000

/s/ Paul Varela  *(Pro Hac Vice Pending)*

Paul A. Varela, Esquire
Todd R. Metz, Esquire
Owen S. Walker, Esquire
*Pro Hac Vice Pending*
VARELA LEE METZ GUARINO, LLP
1600 Tysons Blvd, Suite 900
Tysons Corner, VA 22102
Telephone: (703) 454-0170
Email: pvarela@vlmglaw.com
        tmetz@vlmglaw.com
        owalker@vlmglaw.com

/s/ R. Miles Stanislaw

R. Miles Stanislaw, Esquire
Florida Bar No. 102861
Law Offices of R. Miles Stanislaw
2711 S. Ocean Dr., Unit 2201
Hollywood, Florida 33019-2761
Email: milesstanislaw@msn.com
Telephone: 206-399-0198

/s/ Sean A. Mickley

Sean A. Mickley, Esquire
Florida Bar No. 0084494
The Lane Construction Corporation
90 Fieldstone Court
Cheshire, CT 06410
Email: smickley@laneconstruct.com
Telephone: (959) 261-6197